COOLEY LLP
ALI M. M. MOJDEHI (123846)
(AMOJDEHI@COOLEY.COM)
JANET D. GERTZ (231172)
(JGERTZ@COOLEY.COM)
4401 Eastgate Mall
San Diego, CA 92121
Telephone:    (858) 550-6000
Facsimile:    (858) 550-6420

[Proposed] Counsel for Debtors and Debtors in Possession
Vail Lake Rancho California, LLC; Vail Lake USA, LLC; Vail
Lake Village & Resort, LLC; Vail Lake Groves, LLC; Outdoor
Recreational Management, LLC; and Agua Tibia Ranch, LLC

## UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| In re | Case No. 12-16684-LA11 |
|---|---|
| VAIL LAKE RANCHO CALIFORNIA, LLC, a California limited liability company, | Chapter 11 |
| Debtor. | **DECLARATION OF THOMAS C. HEBRANK IN SUPPORT OF DEBTORS' AND DEBTORS IN POSSESSIONS' FIRST DAY MOTIONS** |

I, Thomas C. Hebrank, declare as follows:

## I.    DECLARANT'S BACKGROUND

1.    I am the Chief Restructuring Officer ("CRO") of Vail Lake Rancho California, LLC, a California limited liability company ("VLRC"), Vail Lake USA, LLC ("VLU"), a California limited liability company, Vail Lake Village & Resort, LLC ("VLVR") , a California limited liability company, Vail Lake Groves, LLC ("VLG"), a California limited liability company, Outdoor Recreational Management, LLC, a California limited liability company ("ORM"), and Agua Tibia Ranch, LLC ("ATR"), a Delaware limited liability company. Each of

VLRC, VLU, VLVR, VLG, ORM and ATR are referred to herein individually as the "Company" or the "Debtor" and are referred to herein collectively as the "Companies" or "Debtors".

2. In this capacity, and in conjunction with the efforts of other members of the Companies' executive and senior management, since the time of my retention, I have been involved in a management role on a day-to-day basis over all aspects of each Companies' affairs, including business operations, strategic planning, financial reporting, human resources, legal affairs and other management activities, as well as each Companies' efforts to address their current financial difficulties.

3. As a consequence, since the time of my retention, I have reviewed and worked extensively with the books and records of each Company, including their respective business plans, financial statements and projections, business analyses and reports, contracts and other legal documents, notes and correspondence and similar issues. On a regular basis, I witness, participate in or have had reported to me discussions and negotiations with vendors, other creditors and stakeholders of each Company, and have worked closely with personnel from all aspects of each Companies' business operations.

4. Based on all of the foregoing, I have developed a familiarity with: (a) the Companies' books and records, which, since the time of my retention, have been maintained in the ordinary course of business under my supervision and control as custodian (and in conjunction with the assistance of other members of each Company's executive and senior management); (b) each Company's respective business and financial history, and its current business and financial situation; and (c) the financial and operation details of each Company's business operations. I have full management and control of the Companies, pursuant to my engagement and authorizing resolutions of each of the Companies.

5. I am a Certified Public Accountant as well as a Certified Insolvency and Restructuring Advisor. I hold a BSBA Degree from Rockhurst University. I have over 30 years of experience in the financial industry and since in the early 1990s, I have managed numerous receivership, bankruptcy, forensic accounting, consulting, and many other workout

projects including both operating companies and a variety of real estate projects. I have extensive, relevant, experience in the real estate market and hospitality industry, generally. I began working with the Companies in my capacity as CRO in May 2013.

6.      Based upon my review of pleadings, historical records and other documentation, and except as otherwise stated herein on information and belief, if called as a witness, I could and would competently testify to the matters set forth herein from my own personal knowledge.

## II.     THE FIRST DAY MOTIONS

7.      I submit this Declaration in support of the Debtors' and Debtors in Possessions' motions for "first day" emergency relief. The Debtors contemplate filing the following motions either concurrently herewith or after entry of an order providing for joint administration of the respective estates: (a) Motion for Order Directing Joint Administration of Related Cases; (b) Motion to Extend Time to File Schedules and Statement of Financial Affairs; and (c) Motion for Limited Notice Procedures. Additionally, the Debtors will file (d) a Motion for an Order Authorizing, on an interim basis, the Employment of Cooley LLP as General Bankruptcy Counsel effective as of the Petition Date (with the final order to follow a noticed hearing); and (e) Motion for an Order Authorizing, on an interim basis, the Retention of Thomas C. Hebrank of E3 Realty Advisors, Inc., as Chief Restructuring Officer (with the final order to follow a noticed hearing). The Debtors are further contemplating the filing of the following motions, pending additional determination as to their imminent necessity: (f) Motion to Continue Bank Accounts and Cash Management Systems; (g) Motion to Pay Prepetition Employee Wages; (h) Motion Prohibiting Utility Companies from Altering, Refusing or Discontinuing Service and Determining Adequate Assurance of Payment for Future Utility Services; (i) Motion to Pay Prepetition Obligations of Critical Vendors; and (j) Motion Authorizing Debtors to Continue Insurance Programs and Pay all Insurance Obligations. A supplemental declaration will be filed respecting these further motions.

8.      The Debtors reserve all rights to amend, supplement or otherwise modify this declaration. All information presented herein is made to the best of the declarant's personal

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

1    knowledge as of the date of this declaration, based upon my review and analysis since the time of

2    my retention, and is subject to change upon obtaining further information.  Nothing herein is or is

3    intended to be an admission as to the validity, amount, and/or priority of any claim.

### III.    BACKGROUND OF COMPANIES

4

5    **A.    Background of Proceedings**

6        9.    On December 26, 2012 (the "Involuntary Petition Date"), an involuntary petition

7    for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") was

8    filed against VLRC, Case No. 12-16684-LA-11. On June 5, 2013, VLRC filed a written answer

9    consenting to entry of an order for relief.  [Doc. No. 42 ].  The Companies therefore expect that

10   the Court will shortly enter an order for relief commencing VLRC's Chapter 11 case.  The VLRC

11   case is the "low number" case among the affiliated Companies, and, as discussed below, the

12   Companies will be filing a motion for joint administration, requesting that all of the Companies

13   cases be administratively consolidated under the VLRC case.

14       10.    The remaining Companies commenced their respective cases by concurrently

15   filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on June 5, 2013

16   ("Petition Date").  Each Company filed its Chapter 11 petition, and, as noted above, VLRC

17   consented to the involuntary petition, in order to provide the Companies with the protection of the

18   Bankruptcy Code to enable them collectively to preserve the intrinsic value of their operations as

19   a going concern, to facilitate an orderly reorganization, and to maximize the value of their assets

20   for the benefit of the economic stakeholders of the bankruptcy estates.

21       11.    The Companies are operating as debtors in possession pursuant to sections

22   1101(a), 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or committee has been

23   appointed in these cases.

24   **B.    General Description of Companies**

25       12.    As discussed further below, the Companies own and operate various businesses on

26   multiple real properties and projects surrounding or relating to a valuable body of water known as

27   Vail Lake.  Vail Lake is a large reservoir in western Riverside County, California, located on

28

Temecula Creek in the Santa Margarita River watershed, approximately 15 miles east of Temecula, California. The Debtors' properties cover approximately 9,000 acres and have an estimated water storage capacity of approximately 51,000 acre-feet. A summary of the Companies' respective ownership is attached hereto as Exhibit "A." In addition, a plot map is attached hereto as Exhibit "B." The Companies' respective assets are both diverse and very valuable. For example, Vail Lake has tremendous value both because of its strategic location and unique characteristics that lend themselves to recreational development but also because its reservoir serves as a main source of water for the Rancho California Water District, which serves the water needs of the ever-growing Temecula Valley.

13.    Various resort and event venue businesses are operated on the Companies' properties. Events held at the properties include weddings, concerts and sporting events. Recent events include the "Tough Mudder" run held in February 2013 and the "Rockin' the Country" concert held over this most recent Memorial Day weekend. General resort operations include RV park and campgrounds facilities, lake access, activities such as horseback riding, waterslides and miniature golf, and gift shop, deli and bar operations. The Companies maintain the premises regularly as part of their business operations. To that end, the Companies employ approximately 30 individuals working in areas such as deli and gift shop operations, maintenance, office administration, and activies operations. As a private lake, memberships, generally annual, are sold that allow members to use the lake facilities for recreational purposes without payment of separate or additional fees. Non-members may also access the lake facilities for daily fees.

14.    A general description of the individual Companies is as follows:

**1.    VLRC**

15.    VLRC is a California limited liability company with its headquarters and principal place of business at 7824 Exchange Place, La Jolla, California. VLRC holds record title to various real properties and projects in Temecula, California, consisting of multiple projects and approximating 565 acres around Vail Lake.

16.     VLRC also owns the surface rights to Vail Lake (15,000 acre feet of storage and recreational rights to the flood easement to Vail Lake) and also owns certain lake usage and water rights, associated with Vail Lake, *e.g.*, grandfathered well rights to Vail Lake.  Further, although not directly related to Vail Lake, VLRC owns a fractionalized interest in additional parcels of land, approximating 540 acres, east of Vail Lake.  VLRC, together with its affiliated Companies, also participates in the operation of various businesses associated with the hospitality and event activities that take place on the properties.  Included in the businesses that are conducted by VLRC (together with its affiliated Companies) are water storage, first-priority water rights and wells for farming activity, an airport, five residential buildings, dry farming, recreational rights to Vail Lake, RV dry camping, tent camping, and a 35,000 person venue for events, and a recreational venue, marina and amphitheatre.  Additionally, VLRC holds contracts with numerous persons pertaining to the license, use and/or access by such persons to Vail Lake and its associated recreational services, in exchange for pre-payment of periodic dues and/or usage fees.

17.     The manager of VLRC is Shining City, Inc. ("Shining City"), a Wyoming corporation of which William Johnson ("Johnson") is the Director, President, Treasurer and sole shareholder.  The equity ownership of VLRC is discussed further below.

18.     All business operations taking place on the property owned by VLRC are managed by its affiliate, ORM. Revenue generated on the property is as a result of business operations, including revenues derived from events held on the property.  No rents, proceeds, products, offspring or profits are derived from the properties held by VLRC themselves.

**2.     VLU**

19.     VLU is a California limited liability company with its headquarters and principal place of business located at 7824 Exchange Place, La Jolla, California. VLU holds record title to various real properties located in Temecula, California, consisting of multiple projects and approximating 6,000 acres immediately adjacent to and surrounding Vail Lake.  VLU also derives revenues from its other business operations conducted together with its affiliated Companies,

1    which, as noted above, are generally related to the hospitality and event activities which take

2    place on its properties, and which are managed by its affiliate, ORM.

3        20.    Any revenue generated on the property is as a result of business operations

4    including revenues derived from events held on VLU's properties. No rents, proceeds, products,

5    offspring or profits are directly attributable to the properties held by VLU themselves.

6        21.    The manager of VLU is Johnson. The equity ownership of VLU is discussed

7    further below.

8    **3.    VLVR**

9        22.    VLVR is a California limited liability company with its headquarters and principal

10    place of business at7824 Exchange Place, La Jolla, California. VLVR holds record title to various

11    real properties and projects located in Temecula, California, consisting of multiple projects and

12    approximating 360 acres southwest of Vail Lake. VLVR also derives revenues from its other

13    business operations, which are generally related to the hospitality and event activities, together

14    with its affiliate VLRC, and which are managed by its affiliate, ORM.  These include the RV park

15    and camping facilities as well as the gift shop, deli and bar operations, which are located on its

16    properties.  VLVR has an ampitheatre for 3000 people, an art gallery of 4000 square feet, an

17    equestrian facility, a go-cart track, three water slides, a remote-controlled race track facility, three

18    swimming pools, 474 full hook-up RV sites, room for 1000 overflow RV campsites (dry

19    campsites), a major beach at Gooseneck Bay, for the benefit of the RV park, 10 full bathroom and

20    shower facilities for the RV guests, laundry facilities, a 4000 square foot restaurant facility (under

21    construction), and paid parking for 3000 vehicles.  It is a duly licensed (by the County of

22    Riverside) facility to hold events of any size without the requirement for a permit.  This

23    Conditional Use Permit also extends to the west of the resort facilities on an additional 400 acres

24    of VLVR property, which would allow an additional 1000 full hookup RV sites to be constructed,

25    with the same duly licensed facility designation.

26        23.    The manager of VLVR is Johnson.  The equity ownership of VLVR is discussed

27    further below.

28

24.     As with the other Companies, all business operations taking place on the property owned by VLVR are managed by ORM. No rents, proceeds, products, offspring or profits are directly attributable to the properties held by VLRC themselves.  Any revenue generated on the properties is as a result of business operations including revenues derived from events held on the property.

**4.     VLG**

25.     VLG is a California limited liability company with its headquarters and principal place of business at 7824 Exchange Place, La Jolla, California. VLG holds record title to various real properties and projects located in Temecula, California, approximating 140 acres near Vail Lake.  VLG, in addition to holding the real properties, operates a farming business, including a citrus grove.

26.     The manager of VLG is Johnson. The equity ownership of VLG is discussed further below.

27.     As with the other Companies, all business operations taking place on the property owned by VLG are managed by ORM.  The revenues generated are entirely the result of business operations, consisting of growing, harvesting, and selling, citrus crops grown on the properties.

**5.     ATR**

28.     ATR is a Delaware limited liability company with its headquarters and principal place of business at 7824 Exchange Place, La Jolla, California. ATR holds record title to various real properties and projects located in Temecula, California, approximating 300 acres near Vail Lake and south of Highway 79.

29.     The manager of ATR is Johnson.  The equity ownership of ATR is discussed further below.

30.     As with the other Companies, certain business operations related to the resort and hospitality activities are conducted on the properties owned by ATR together with its affiliated Companies. No rents, proceeds, products, offspring or profits are directly attributable to the

Cooley LLP
Attorneys At Law
San Diego

1    properties held by ATR themselves.  Any revenue generated on the property is as a result of

2    business operations including revenues derived from events held on the properties.

3        **6.    ORM**

4        31.    ORM is a California limited liability company with a principal place of business at

5    7824 Exchange Place, La Jolla, California.  ORM provides management services to the affiliated

6    Companies related to the resort and event venue and other associated businesses conducted on the

7    Companies' respective properties.

8        32.    The manager of ORM is Johnson.  The equity ownership of ORM is discussed

9    further below.

10   **C.    The Companies' History**

11       33.    Any analysis of the Companies' capital structure necessarily needs to start with the

12   genesis of the Companies' ownership of the real properties and the factual basis for the secured

13   claims being asserted against the Companies' assets.  The history rightfully begins with the earlier

14   bankruptcy case of another affiliate under common control, North Plaza, LLC ("North Plaza").

15       **1.    Background Beginning With North Plaza, LLC**

16       34.    North Plaza, a California limited liability company, owned as its primary asset

17   certain real property consisting of approximately 40 acres of land located in Temecula, California.

18   North Plaza was the subject of an involuntary bankruptcy filing in 2004 (*In re North Plaza, LLC*,

19   Case No. 04-00769, United States Bankruptcy Court, Southern District of California) during the

20   course of which a Chapter 11 Trustee was appointed ("North Plaza Trustee").  Leading up to its

21   bankruptcy, Shining City, which as noted above is owned and controlled by Johnson, owned a

22   majority interest in North Plaza and the entity was managed, at least by the terms of its operating

23   agreement, by Robert Chambers ("Chambers"), one of its members (indirectly with ownership

24   through certain entities).

25       35.    In or about mid-1995, Johnson became aware of an opportunity to purchase real

26   estate in Temecula, including numerous properties surrounding and underlying Vail Lake, which

27   was then owned by affiliates of the Kemper Insurance Company ("Kemper").  The first of several

28

1    eventual purchases from Kemper was that of the properties ultimately transferred by grant deed to

2    North Plaza.  Purchased in June 1996, the North Plaza property acquisition was initially funded

3    by money from one or more of its members as well as two secured loans from a certain Kenneth

4    G. Barth, Trustee ("Barth") and Dunham & Associates Mortgage Fund II, LP ("Dunham").

5    These loans were later refinanced by Angela Sabella ("Sabella") (and subsequently also known as

6    Angela Chen and Angela Chen Sabella), and Sabella's lending entity, Dynamic Finance

7    Corporation ("Dynamic").  Sabella and Dynamic are classic "hard money" lenders and are the

8    predecessors in interest to the (asserted)[1] senior secured lender to the Companies, Cambridge

9    Financial of California, LLC ("Cambridge").

10    36.    Next, in September 1996, VLU was formed to purchase additional properties from

11    Kemper constituting the properties around Vail Lake now owned by VLRC, VLVR and VLU and

12    associated water, lake, and contract rights.  The initial members of VLU were North Plaza, James

13    and Doreen Bree ("Bree"), Peter and Dorothy Suprunuk ("Suprunuk") and Shining City.  In

14    November 1997, VLU and Kemper entered into a binding option agreement to purchase the

15    subject properties. However, in December 1997, the transaction closed as to only a portion of the

16    properties. The purchase price of approximately $5,750,000 (plus closing costs) was financed by

17    (i) a seller carry-back from Kemper of $2,500,000; (ii) a loan from Barth of $3,250,000 secured

18    by a portion of the property; and (iii) a loan from Sabella of $500,000.  The loan by Sabella was

19    secured by the North Plaza property and personally guaranteed by Johnson.  Also, in December

20    1997, VLU entered into an amended option agreement with Kemper for the remaining Vail Lake

21    property.

22    37.    Against this background, and in light of other facts not included here in detail, at

23    least as of December 1998 Sabella personally, along with her lending entity, Dynamic, had

24    succeeded in obtaining financial dominion and control, both over Johnson and VLRC, VLVR

25    and VLU. By January 1999, the seller financing extended by Kemper on the VLU property was

26    coming due as well as the secured lending by Barth. Additionally, the loan by Sabella for

27

28    _____

[1] As noted herein, the Companies dispute the priority, validity, and amount of Cambridge's asserted liens.

$500,000 had matured in late 1998, and by this time, Sabella had already threatened foreclosure and execution against Johnson's personal guaranty, among other things. In or about January 1999, then, Sabella articulated clearly that any further financing by Sabella and/or Dynamic would require that Sabella be granted a substantial equity ownership in VLU and that Johnson be required to buy out the existing members of VLU, to facilitate his entering into a partnership with Sabella in connection with the venture, under which they would hold the equity ownership.

38.    In February 1999, Sabella offered Johnson a proposal under which Dynamic would extend financing of $4,900,000 to VLU to pay Kemper, to provide a deposit for a separate entity to purchase additional property, and to buy out the Bree membership interest in VLU. As a pre-condition to the purported "financing," Johnson and Shining City were required to enter into option agreements granting Sabella/Dynamic options to purchase membership interests in VLVR and VLU. In February 2000, a similar agreement was entered in connection with an additional loan by Sabella made for the purpose of buying out existing members of VLU. Sabella's/Dynamic's financings in connection with North Plaza as well as the Vail Lake properties were conditioned upon Sabella's receipt of equity in the Companies and were not advanced in the capacity as a traditional lender.

39.    In this manner, and toward the goal of obtaining exclusive equity ownership of VLU, VLVR and VLRC, Sabella/Dynamic moved quickly to extend their influence and control, primarily by virtue of the imposition of onerous and egregious terms in the loans they made to the entities, as well as to Johnson personally. Indeed, by July 2000, Sabella/Dynamic had substantial encumbrances on virtually all of the properties held by VLU and affiliates, as well as North Plaza. Such security interests were often created by way of cross-collateralization without consideration and further, were securing purported loans that were violative of California's usury laws. The details of each transaction are not recounted for present purposes. But, in sum, Sabella/Dynamic were not ordinary lenders operating at an arm's length in these transactions. Rather, Sabella/Dynamic entered into loan transactions with North Plaza and certain of the Companies for

1   the express purpose of obtaining ownership and control of the properties owned by the

2   Companies.

3       40.     From approximately 1996 onward, then, various of the Companies entered in to

4   numerous financial transactions with Sabella and her affiliate Dynamic, including purported loans

5   secured by the Companies' respective properties that were both fraudulent and usurious, among

6   other things.  At the same time, Dynamic and Sabella made continual associated demands

7   regarding Sabella's and/or Dynamic's desire for additional equity ownership in the Companies.

8       41.     In the North Plaza bankruptcy, the North Plaza Trustee thoroughly investigated a

9   substantial amount of such transactions, which were inextricably linked to the Companies'

10  dealings with Dyanmic and Sabella.  The Hon. Peter Bowie found that Dynamic had waived the

11  attorney-client privilege, resulting in the production by Dynamic of a multitude of documents

12  relating to communications with counsel, and ultimately, their placement into the public record.

13  In light of the evidentiary record, the Trustee ultimately objected to and otherwise challenged the

14  claims asserted by Sabella and Dynamic against the North Plaza estate, on grounds of, *e.g.*, lender

15  liability, fraudulent conveyance, recharacterization, fraud, and usury.  The Trustee also asserted

16  numerous affirmative claims for relief in the form of damages, as against a number of defendants

17  including Sabella and Dynamic as well as VLRC, VLVR and VLU.  The North Plaza Trustee's

18  causes of action included: breach of fiduciary duty; aiding and abetting breach of fiduciary duty;

19  fraud; constructive fraud; material misrepresentation made in connection with securities

20  transaction; rescission; conversion; conspiracy; and violation of the Racketeer Influenced and

21  Corrupt Organizations Act.

22      42.     The North Plaza Trustee settled his claims with Sabella and Dynamic by way of a

23  settlement agreement entered into in October 2010 and approved by the court in March 2011.  As

24  discussed further below, the North Plaza Trustee has since settled his claims with VLVR and

25  VLU.

26      43.     The history of the North Plaza Trustee's investigation of Sabella and Dynamic in

27  the North Plaza bankruptcy is highly relevant here.  It is relevant, because, as evidenced by the

28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

1   pleadings filed and public record of numerous evidentiary hearings held in that case, the

2   transactions between North Plaza, Sabella, and Dynamic were, in a substantial measure,

3   inextricably linked with the lending transactions that Sabella and Dynamic entered into with the

4   Companies, and in many instances, were the *same* lending transactions.  The facts adduced in

5   North Plaza are therefore extremely helpful in connection with the understanding of the

6   Companies' own capital structure, discussed below.

7   **D.    The Companies' Capital Structure[2]**

8       44.    Based upon my review of the Companies' books and records, the Companies'

9   consolidated assets, as of May 31, 2013, total approximately $291,016,000, broken down as

10  follows[3]:

|  | Consolidated | VLRC | VLU | VLVR | VLG | ORM | ATR |
|---|---|---|---|---|---|---|---|
| **Total Assets** | $291,016,400 | $112,137,500 | $140,125,200 | $21,806,400 | $3,600,000 | $500 | $13,346,800 |
| Real Property | $241,015,900 | $62,137,500 | $140,125,200 | $21,806,400 | $3,600,000 |  | $13,346,800 |
| Water Rights | $50,000,000[4] | $50,000,000 | tbd | tbd | tbd |  | tbd |
| Cash & Cash Equivalents | $500 | n/a | n/a | n/a | n/a | $500 | n/a |
| Net Accounts Receivable | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Related Party Net Accounts Receivable | tbd | tbd | tbd | tbd | tbd | tbd | tbd |
| Inventories | tbd | tbd | tbd | tbd | tbd | tbd | tbd |
| Prepaid Expenses and Other Current Assets | tbd | tbd | tbd | tbd | tbd | tbd | tbd |
| Notes Receivable | tbd | tbd | tbd | tbd | tbd | tbd | tbd |
| Related Party Notes Receivable | tbd | tbd | tbd | tbd | tbd | tbd | tbd |
| Other Assets | tbd | tbd | tbd | tbd | tbd | tbd | tbd |

---

[2] The Debtors reserve all rights to dispute the validity, amount, and/or priority of any claim against the estates, including objecting to claims and/or instituting adversary proceedings on any available grounds.  Nothing included in this declaration or any of the Debtors' first day motions is or is intended to be an admission as to the validity, amount, and/or priority of any claim.  Further, the Debtors reserve all rights with respect to the assumption or rejection of any unexpired leases or executory contracts and nothing stated herein is intended to effectuate an assumption or rejection thereof.

[3] All figures are approximate, made to the best of the declarant's personal knowledge as of the date of this declaration, and subject to adjustment.

[4] This is a very conservative estimate.  The value of the water rights are likely to be much higher, conceivably in the hundreds of millions of dollars.

### 1.    Disputed Nature of Sabella/Cambridge Claims

45.    As noted above, beginning in 1998 Sabella and Dynamic advanced funds, the true amount of which is disputed, characterized as loans secured by the properties owned by the Companies.  Such advances were, in actuality, part of a concerted scheme to obtain ownership of the Vail Lake properties and associated water rights.  The purported financing by Sabella/Cambridge, in excess of $30,000,000 in principal amount on its face, is belied by the documentary evidence.  The stated "principal" is the result of numerous short term notes rolling over prior loans at usurious interest rates and with improper charges and fees.  Not only is the principal amount greatly exaggerated, but the transactions likely fail for lack of consideration, in that they were clearly designed to solidify Sabella's and Dynamic's economic dominion over the Johnson and the Companies in a bid for obtaining the exclusive ownership thereof.

46.    Importantly, it is not necessary to guess about Dynamic and Sabella's motivations or subjective intent or lack of good faith.  As was revealed in the North Plaza bankruptcy, Sabella and Dynamic's then counsel—a highly respected national bankruptcy firm—*repeatedly* warned them in writing that their actions both implicated and invited lender liability actions against them, and that their loans may be subject to subordination and disallowance, based upon the various inappropriate actions on their part, including, without limitation their overreaching attempts to control the equity ownership of the Companies.  The warnings by counsel were extraordinary in their objectivity and frankness.  These warnings went substantially ignored by Dynamic and Sabella, who continued their wrongful path of conduct, despite counsel's multiple admonitions.

47.    Further, the Companies believe that some, if not all, of the promissory notes given to Dynamic and Sabella were executed without proper corporate authority.  As such, the notes are likely void or voidable.

48.    The Companies intend to promptly move to seek avoidance of the Sabella/Dynamic liens, now purportedly assigned to Cambridge, on grounds including, without limitation, avoidance as fraudulent transfers as well as avoidance for lack of perfection.  In additional to avoidance of the liens and disallowance of their secured status, the Companies further intend to seek equitable subordination or recharacterization of any claims asserted by

Cambridge or Sabella/Dynamic, as the case may be.  Likewise, the Companies are evaluating affirmative causes of action for relief to be pursued by the estates, as against Dynamic and Sabella and others, for the benefit of its legitimate stakeholders.

**2.    Sundance Note and Judgment**

49.    As explained below, the Companies purchased the Vail Lake properties and related rights from Kemper and its affiliates in the late 1990s.  Prior to 1993, however, Sundance International, LP ("Sundance") owned land to the East of the Kemper properties and operated a dude ranch on a portion of its holdings.  In 1993 and 1994, Kemper and Sundance entered into a series of agreements involving the rights of Sundance's members to use Vail Lake. As part of the transaction, Sundance purchased two parcels, a 350 acre parcel on the east side of Vail Lake and a 95 acre parcel immediately adjacent to and on the west side of Vail Lake.  As consideration for the purchase, Sundance executed a $450,000 promissory note, secured by a deed of trust on the two parcels.

50.    As part of the Companies' initial acquisitions from Kemper, they purchased the Sundance agreements relating to lake access as well as the Sundance notes and deeds of trust.  Later, in 2000, VLRC sued Sundance and related entities and individuals for judicial foreclosure and damages for their sustained and material breaches of their lake usage agreements, and in 2004, was awarded judgment in excess of $18 million along with judicial foreclosure of the 95-acre parcel which was acquired by credit bid by VLRC.  Thereafter, the 350-acre parcel was sold by execution and again acquired by VLRC by credit bid.

51.    VLRC continues to hold record title to the two parcels.  Additionally, Johnson is the holder of the Sundance note and deed of trust.  Although VLRC assigned the note and deed of trust to Sabella in and around 1998 in connection with advances she made to the Companies, which are discussed further below, Sabella assigned her rights to the note and deed of trust to Johnson effective October 1999.  Cambridge has recently attempted to foreclose on the note and deed of trust as the purported assignee of Sabella, however, any such assignment is void. The Companies are in the process of investigating the assets of the Sundance to evaluate what action,

1   if any, should be undertaken by the estates to collect on the money judgment which may be a

2   substantial source of recovery for the benefit of the creditors of the estates.

3       52.    In addition to the judgment against Sundance of $18 million, plus pre-judgment

4   interest, VLRC also obtained a judgment against the principal of Sundance, Gary Clausen in the

5   amount of $5 million, plus pre-judgment interst, and a judgment in the amount of $5 million

6   against Clausen's attorney, John Mulder, plus pre-judgment interest.  VLRC has a perfected

7   judgment liens on all three judgments, which has been only partially satisfied by virtue of

8   enforcement against Sundance's real property.  The collectability of the judgment against Clausen

9   is unknown, as it would require collection efforts against assets located in Canada.

10  **3.    Water Rights**

11      53.    As noted above, there are extremely valuable lake usage and water rights

12  associated with Vail Lake that are owned by VLRC.  The value of these lake usage and water

13  rights is currently unknown, but may likely be in the hundreds of millions of dollars.  The

14  Companies anticipate seeking Court approval in the future for the retention of special counsel or

15  other experts in connection with obtaining a further valuation of the water rights relevant to this

16  matter.

17      54.    Based on my review of the Companies' unaudited, condensed consolidated

18  balance sheet, as of May 31, 2013, the Companies' consolidated liabilities totaled approximately,

19  $52,796,846 broken down as follows:[5]

| | Consolidated | VLRC | VLU | VLVR | VLG | ORM | ATR |
|---|---|---|---|---|---|---|---|
| **Total Liabilities** | $52,796,846 | $8,982,650 | $29,210,636 | $12,003,416 | $890,247 | $938,629 | $771,268 |
| Trade Accounts Payable | $331,041 | $14,532 | $45,884 | $26,204 | $14,140 | $230,281 | |
| Related Party Notes Payable | | | | | | | |
| PropertyTaxes | $5,616,355 | $43,889 | $4,580,139 | $330,410 | $373,128 | | $288,789 |
| Notes Payable | $471,250 | $471,250 | | | | | |
| Accrued and Other Liabilities | $46,378,200 | $8,452,979 | $24,584,613 | $11,646,802 | $502,979 | $708,348 | $482,479 |

[5] All figures are approximate, made to the best of the declarant's personal knowledge as of the date of this declaration, and subject to adjustment.

Cooley LLP
Attorneys At Law
San Diego

### 4.   Alleged Real Property Encumbrances by Cambridge

55.    As described above, beginning in and around 1998, Sabella and the lending entity owned and controlled by Sabella, Dynamic, purported to extend a series of loans secured by various of the Companies' properties.  Claims associated with these loans are disputed on numerous grounds, including as discussed above. The following chart summarizes the principal amounts of the purported loans that the Debtors understand Sabella and Dynamic to assert are outstanding:

| Debtor | Principal Amount |
| --- | --- |
| VLRC | $2,000,000 |
| VLVR | $5,000,000 |
| VLVR | $3,500,000 |
| VLU | $5,400,000 |
| VLU | $17,000,000 |

56.    In September 2010, Sabella and Dynamic purported to assign their interests in the notes associated with the asserted loans described above and related deeds of trust to Cambridge. The assignment appears to be a sham transaction as, among other things, Cambridge's assignment was financed by non-interest bearing notes held by Sabella and Dynamic and further provides for reversion to Sabella and Dynamic if Cambridge does not successfully foreclose on the notes and deeds of trust.  In substance, therefore, Cambridge appears to hold the position of an optionee.  To this end, Sabella and Dynamic have agreed to cooperate and aid Cambridge in obtaining the Companies' properties.

57.    The Companies are aware of further asserted debts secured by various of the Companies' properties. In particular, there are a number of security interests formerly held by Clifford Douglas ("Douglas") and purportedly assigned to an affiliate of Cambridge, XD Conejo Notes, LLC. The Companies are evaluating the validity of the underlying debt and purported assignment.

### 5.   Property Taxes

58.    The County of Riverside ("County") has assessed property tax defaults totaling approximately $5,616,000 as of June 5, 2013, against 34 parcels of land owned variously by VLRC, VLG, VLVR, VLU, and ATR.  The Debtors are informed and believe that the County has entered an agreement with the Rancho California Water District ("Water District") for the sale of

1    the tax defaulted properties to the Water District.  Such agreement is subject to a right of

2    redemption by the respective Debtors.  The Agreement only becomes effective if the Debtors fail

3    to redeem on or before June 5, 2013 at 5 p.m.  As such, the Agreement's effectiveness is stayed

4    by the bankruptcy automatic stay, which is imposed as of the Involuntary Petition Date and the

5    Petition Date, respectively.

6         **6.**    **Personal Property Encumbrances**

7        59.    On review of the results of a lien search performed on the Companies' behalf, the

8    following summarizes the known personal property liens filed against certain of the Companies:

| Debtor | Creditor | General Collateral Description | Amount |
|--------|----------|-------------------------------|--------|
| VLRC | Blum Collins LLP (UCC Financing Statement Expires: 3/20/14) | Citrus fruit | $0 |
| VLU | IRS (Federal Tax Lien Expires: 4/2/19) | All property and rights to property | $750 (as of 2009) |
| | Blum Collins LLP (UCC Financing Statement Expires: 3/20/14) | Citrus fruit | $0 |
| | Ted Goldberg, Trustee (UCC Financing Statement Expires: 7/9/15) | Citrus fruit (2010 and 2011 only) and net revenue therefrom | $0 |
| | Phillips, Haskett & Ingwalson (UCC Financing Statement Expires: 5/25/17) | Citrus fruit (undivided 35% interest) | $1,500,000 |
| VLVR | CA Employment Development Dept. (State Tax Lien Expires: 2/1/15) | All property and rights to such property, including all after-acquired property | $16,806.54 (as of 2005) |
| | CA Employment Development Dept. (State Tax Lien Expires: 7/5/16) | | $28,131.90 (as of 2006) |
| | CA Employment Development Dept. (State Tax Lien Expires: 6/21/17) | | $18,423.77 (as of 2007) |
| | CA Employment Development Dept. (State Tax Lien Expires: 10/23/17) | | $1,557.92 (as of 2007) |
| | CA Employment Development Dept. (State Tax Lien Expires: 9/22/19) | | $6,906.89 (as of 2009) |
| | CA Employment Development Dept. (State Tax Lien | | $13,423.30 (as of 2012) |

Cooley LLP
Attorneys At Law
San Diego

| | | | |
|---|---|---|---|
| | Expires: 4/12/22) | | |
| | Sysco Food Services of San Diego, Inc. (UCC Financing Statement Expires: 10/17/13) | Good and inventory; Instruments; Chattel paper; Documents; Accounts; Accounts receivable; General intangibles; Payment Intangibles; and All proceeds and support obligations thereof | Unknown |
| | Blum Collins LLP (UCC Financing Statement Expires: 3/20/14) | Citrus fruit | $0 |
| | IRS (Federal Tax Lien Expires: 8/12/19) | All property and rights to property | $7,124.49 (as of 2009) |
| | IRS (Federal Tax Lien Expires: 12/14/22) | | $245,527.23 (as of 2012) |

60.    In addition, Dynamic filed a UCC-1 in connection with its asserted lien on certain of the Companies' personal property.  The UCC financing statement has expired and is avoidable by the Debtors, for the benefit of the Debtors' estates.

**7.    Intercompany Transactions**

61.    The Debtors have, from time to time in the past, incurred numerous complex intercompany obligations.  The Debtors are still in the process of assessing the extent of such intercompany obligations.  The extremely interconnected nature of the Companies' debts and obligations will likely merit strong consideration of the remedy of substantive consolidation of the Companies.

**8.    Equity**

62.    The following table summarizes the ownership of membership interests in the Companies:

| **Debtor** | **Equity Ownership** |
|---|---|
| VLRC | Shining City (75%) Sabella (25%) |
| VLU | Shining City (100%) |
| VLVR | Shining City (99%) Johnson (1%) |
| VLG | Johnson (100%) |
| ORM | Johnson (100%) |
| ATR | Johnson (50%) William Johnson and Patricia Johnson Family Trust (50%) |

63.    Sabella has asserted additional membership interests in VLRC (5%), VLU (30%) and VLVR (30%), which are disputed by the Companies.

**E.**     **The Events Leading to the Present Chapter 11 Case**

64.     Most immediately, the present filings and uncontested involuntary petition are precipitated by insufficient liquidity and as such, serve to allow the Debtors to preserve their operations as a going concern for the benefit of their economic stakeholders.  The current financial issues faced by the Debtor are attributable largely to the wrongful acts of Sabella and Dynamic, which, as noted above, were undertaken in a concerted effort to obtain ownership of the Debtors' and their respective assets.  As summarized below, the fraudulent and unscrupulous conduct of Sabella and Dynamic caused the Debtors' properties to be encumbered with invalid and inflated liens and further affirmatively prevented the Debtors from maximizing their value.

65.     Relatedly, and in addition, the Companies are party to number of pending lawsuits that can be briefly summarized as follows:

(a)     *Chen v. Shining City et al.*: Sabella, now going by the name Angela Chen, has sued VLRC, Shining City and Johnson in Riverside Superior Court (Case No. RIC1210424) alleging various acts of fraud and other misconduct and has obtained a preliminary injunction prohibiting certain conduct by VLRC and its principals, including filing for bankruptcy relief and transferring any of its property. No trial date has been set.

(b)     *Cambridge v. Johnson*: Cambridge has sued Johnson, together with his spouse Patricia Johnson, in Riverside Superior Court (Case No. RIC1115973) for sums owed on personal guarantees in principal amounts totaling approximately $32,000,000. The Johnsons, VLU and VLRC have filed a cross-complaint alleging various wrongful acts on the part of Cambridge's assignors, Sabella and Dynamic. No trial date has been set.

(c)     *Elysian v. VLU et al.*: Elysian Events, LLC ("Elysian") has sued VLU, VLRC and ORM in Riverside Superior Court (Case No. 1209275) alleging damages on various theories as a result of cancellation of an events contract. No trial date has been set. Elysian was granted relief from stay in the bankruptcy proceeding of VLRC to continue this suit to judgment, but was not denied relief from stay to enforce any resulting judgment.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

1        (d)    *VLRC v. Clawson et al.*: VLRC has brought an action against Kid Gloves,

2    Inc. ("Kid Gloves"), Kelly Abreu, Vail Custodial Services and others in San Diego

3    Superior Court (Case No. 37-2009-00094633-CU-FR-CTL) seeking to cancel two notes

4    and trust deeds, for wrongful foreclosure and for marshalling of assets. Judgment was

5    entered denying the request to cancel the note and trust deeds, setting the amount due on

6    the notes and ordering marshalling of assets. VLRC appealed the judgment, and the

7    defendants have filed a cross-appeal. The parties are currently briefing the issues on those

8    appeals. Kid Gloves, and an entity named 1690463 Alberta Ltd., have moved the Court

9    for relief from stay as against VLRC connection with the state court suit.

10       (e)    *Bree v. Johnson et al.*, Riverside Superior Court Case No. RIC400076,

11   filed 09/19/2003.  This Complaint, for breach of contract, brought by James and Dorene

12   Mae Bree (the "Brees"), alleges breaches in connection with a buyout of the Brees 30

13   percent VLU membership interest, as well as alleged continuing breaches against them by

14   Johnson, and others, relating to alleged actions taken to preclude the Brees from receiving

15   the consideration for the transfer.  The complaint also alleges that fraudulent

16   misrepresentations were made by Johnson and others in connection with the sale of the

17   membership interest.  The case remains pending.

18       (f)    2.    *Bree v. Johnson*, Riverside Superior Court Case No. RIC399683,

19   filed 09/10/2003.  This complaint, brought by the Brees, for foreclosure, relates to the

20   several deeds of trust recorded against various real properties, including those owned by

21   the Debtors, in or about late 2002.  The Complaint sought reformation, imposition of

22   equitable lien, judicial foreclosure, and damages.  On March 13, 2013, the Riverside

23   Superior Court held a Hearing on OSC re: Dismissal after Settlement Pursuant to Rule

24   3.1385(B).  The case currently reflects a status "Closed and Marked as Disposed."

25   **F.**    **Efforts Taken to Ameliorate the Companies' Financial Distress**

26       66.    Leading up to the present proceedings, the Companies have taken actions designed

27   to maximize their value, improve their consolidated balance sheet, and generate healthy cash flow

28

Cooley LLP
Attorneys At Law
San Diego

21

and profitability.  A further, more detailed, discussion of the actions taken by the Companies, divided by category, follows below:

**1.      Attempts to Negotiate with Sabella or Consummate an Asset Sale to a Third Party**

67.      After obtaining effective financial control of Johnson and his entities, Sabella sought to ensure her ultimate ownership of the Vail Lake properties by withholding funds needed for development and instead rolling over advances made by herself and Dynamic into short term loans at usurious interest rates and uniformly cross-collateralized, as a means of attempting to ensure the properties could not be successfully entitled or operated.  On the part of the Companies, Johnson continuously attempted to work with Sabella but was effectively tied up by his partner.

68.      Despite Sabella's conduct, in 2005, the Companies were successful in negotiating the terms of a sale to KB Home Coastal, Inc. ("KB"), pursuant to which the real properties held by VLRC, VLVR and VLU, *excluding* any lake membership rights and any water rights to the lake itself, would be sold for a sale price of $200,000,000.  A detailed term sheet was negotiated, and numerous purchase and sale contract drafts were exchanged, however, the Companies could not actually execute the purchase and sale agreement without Sabella's consent.  Sabella withheld her consent, while attempting to extort additional equity ownership interests in certain of the Companies—apparently in an effort to obtain ownership of the remaining water rights for herself. An agreement with Sabella was negotiated, referred to as the Membership Transfer Agreement, wherein Sabella agreed to consent to the KB Homes sale in exchange for the demanded ownership interests and further agreed that in the event the sale did not close, she and Dynamic would provide funding to the Companies for certain impact litigation and to pursue entitlements.

69.      Nonetheless, because of Sabella's failure to utilize best efforts to maximize the profitability of the Companies and otherwise conflicted action in withholding consent to the KB Home sale, KB withdrew from the acquisition transaction.  Not only did Sabella wrongfully and unreasonably withhold consent to the transaction with KB, she subsequently refused to provide

the funding she had agreed to in the Membership Transfer Agreement, each in breach thereof, causing the companies damages of upwards of $100,000,000.

### 2. Settlement of Certain Claims/Causes of Action

70.      As discussed above, in the North Plaza bankruptcy proceeding, the North Plaza Trustee pursued a number of causes of action for affirmative relief against VLRC, VLVR and VLU with the potential for substantial damages as well as significant time and costs expenditures in defending a complex adversary proceeding. In their business judgment, and after arm's length negotiation with the North Plaza Trustee, the adversary proceeding was settled as to VLVR and VLU, with approval of the bankruptcy court by order entered May 7, 2013.  Pursuant to the settlement, the North Plaza Trustee is a creditor of the Companies' estates.

### 3. Expansion of Business as Entertainment and Sporting Venue

71.      Since approximately 2010, the Debtors have worked diligently to expand their business as a sporting and entertainment venue.  In particular, VLRC and VUSA have uncovered an existing plot plan approval by the County of Riverside, which entitles them to utilize 25,000 acres of their properties for public venue activities, without the requirement of a permit from the County of Riverside.  This avenue of business operations is particularly promising for expansion and monetization, given Vail Lake's unique location in proximity to San Diego, Orange County, and Los Angeles alike.  The Debtors efforts to date have largely been met with success, however, the present filings and consent to order for relief are necessary to provide all the Debtors with the requisite breathing room to continue to develop their business operations in this arena in order to maximize value for all stakeholders involved.

### 4. Retention of Chief Restructuring Officer

72.      Additionally, in May 2013, the Companies retained me personally and E3 Realty Advisors, Inc. ("E3 Advisors") as their Chief Restructuring Officer ("CRO").  Since my retention, I have diligently worked to gain a thorough understanding of the businesses.  I have assisted the Companies in numerous restructuring and crisis management matters designed to preserve and maximize the value of the Companies and their assets, including (i) assisting the Companies in

preparing financial and other materials in connection with commencement of this proceeding and (ii) assisting the Companies in connection with risk management.

73.     Although the actions mentioned above produced significant positive results, they were not sufficient to avoid the instant filings.  The Companies have worked with diligence to seek strategic alternatives that might have avoided these bankruptcy proceedings.  Due, however, to the Companies' present inability to generate sufficient cash flow and other liquidity strictures, the Companies have been required to seek the protection of this Court in order to obtain the necessary relief from their creditors to provide the necessary time to reorganize, thereby preserving the value of the Companies.

## IV.   CHAPTER 11 CASE

### A.   General Objectives and Overall Strategy

74.     The objective of the Companies' Chapter 11 cases is to maximize value for the stakeholders of their respective estates.  As noted above, the Companies contemplate objecting to the claims of Cambridge and otherwise prosecuting actions for affirmative relief as against Sabella, Dynamic, and their affiliated entities, for the benefit of the estates.  The Companies further contemplate a joint reorganization designed to preserve the Companies, collectively, as a going concern as a means of maximizing value.  As noted above, the interconnected nature of the Companies' transactions and highly complex documentary record of these transactions appear to strongly support the use of the remedy of substantive consolidation.

### B.   Immediate Matters

75.     The Companies are concurrently filing an emergency ex parte first day motion to administratively consolidate the bankruptcy cases of VLRC, VLU, VLVR, VLG, ATR and ORM concurrently with this declaration. As discussed in the application, the Debtors are affiliates of one another and share common management. The Debtors have related cases before the Court and intend to file numerous motions and applications that apply to all, or multiple, of the Debtors' cases and which involve the same nucleus of facts.  Joint administration will eliminate

unnecessary duplication of resources and would facilitate efficient, expedient, convenient and economical administration of the Debtors' bankruptcy estates.

76.    Concurrently with the motion for joint administration, or upon entry of an order granting the same, the Companies will jointly filed a number of first day motions that necessitate immediate relief in order to ensure a successful transition into Chapter 11 bankruptcy, maintain operations, and avoid disruption in the ability of the Companies to address required administrative matters.

### 1.    Retention of General Bankruptcy Counsel

77.    Cooley LLP ("Counsel") has been engaged, subject to Court approval, to serve as general bankruptcy counsel to each Company as Debtors and Debtors in Possession.  Prior to the Petition Date, Counsel provided certain pre-petition legal services to the Companies in contemplation of or in connection with these Chapter 11 cases.  Further disclosure relating to Counsel's employment is included in the application for retention and the declaration of Ali M.M. Mojdehi, Esq. to be filed after an entry of an order on the Debtors' application for joint administration.  As is discussed in those disclosures, Counsel also served as counsel to the North Plaza Trustee.  Counsel has a depth of understanding regarding the Companies' past transactions, debt structure and a detailed understanding regarding the historical facts and documents relating to same, which would serve to significantly reduce the expense to the estates and would aid in a speedy administration of these cases.  The North Plaza Trustee has expressly consented to Counsel's representation of the Companies.  In granting that consent, the North Plaza Trustee has agreed that in the unlikely event that any further dispute was to arise between the Debtors and the North Plaza Trustee, in such case, independent counsel would be retained with respect to the representation in connection with any such dispute.  Counsel has also agreed with the North Plaza Trustee to implement procedures to protect and safeguard the confidential information of the North Plaza estate from use or disclosure in the representation of the Debtors, except as the North Plaza Trustee may otherwise expressly direct.

## 2.     Retention of Chief Restructuring Officer

78.     The Companies will also file a joint motion for the continued retention of myself and E3 Advisors to serve as Chief Restructuring Officer to the Companies as Debtors and Debtors in Possession.  In their sound business judgment, the Companies have determined that my retention and the retention of E3 is essential to maintaining continuity in the Debtors' operations and to imparting the extensive experience in bankruptcy and related capacities to lead the Debtors through the many initial tasks of a debtor in possession as well as its continuing duties throughout these proceedings.

79.     I am highly qualified to act as CRO for the Debtors, having served in numerous fiduciary and other capacities in varying contexts, and having been involved in a number of bankruptcy proceedings.  My experience will substantially enhance the Debtors' ability to operate and meet their administrative obligations in these consolidated proceedings and ultimately, to preserve and maximize the value of its assets to the benefit of all constituencies involved. Further, as a result of prepetition work performed on behalf of the Companies, both myself and E3 Advisors have acquired significant knowledge of the Debtors and their business and are now familiar with the Debtors' consolidated financial affairs, debt structure, operations and related matters that will assist in providing the Debtors with effective and efficient services in these bankruptcy proceedings.  Absent approval of my employment and the employment of E3 Advisors, the Debtors would each be forced to seek the engagement of a new CRO, which I believe would involve a material time and monetary cost, to the detriment of their estates and creditors.

80.     The terms and conditions of E3 Advisors' engagement agreement were negotiated by the Debtors and myself, on behalf of E3 Advisors, at arm's length and in good faith.  The Debtors have informed me that in their business judgment, they have determined that the terms of the engagement agreement with myself and E3 are within the range of those for senior executive officers employed with the companies of comparable size, value and reputation.  The services to be performed by myself and E3 Advisors are outlined in detail in the motion seeking approval of my retention as well as my separate declaration in support of the application for employment,

1   which includes the engagement agreement as an attachment, both to be filed after an entry of an

2   order on the Debtors' application for joint administration.  In short, the services of myself and E3

3   Advisors are necessary and essential to providing overall leadership in the reorganization process,

4   assisting the Debtors in meeting their administrative burdens, and preserving and maximizing the

5   value of the Debtors in its day-to-day operations.

6        81.    The Debtors require myself and E3 Advisors to continue providing the services of

7   an experienced CRO and crisis manager, without interruption, in order to guide existing

8   management through a restructuring of the Debtors' operations and a successful resolution of

9   their chapter 11 cases.  Delay of such services could cause irreparable harm to the Debtors and

10  their respective estates.

11       **3.    Extension of Time to File Schedules**

12       82.    I am familiar with the forms for the schedules of assets and liabilities and

13  statement of financial affairs, as well as other documents such as the list of entities required by

14  Federal Rule of Bankruptcy Procedure 1007(a)(1), (collectively, the "Schedules") that each

15  Debtor is required to file with the Court.  Based upon my knowledge of the nature and scope of

16  the Debtors' business and financial affairs, I do not believe that either Debtor can carefully,

17  thoroughly, and accurately prepare their respective Schedules within fourteen (14) days of the

18  Petition Date or the Involuntary Commencement Date.

19       83.    There are a substantial number of creditors and potential creditors of each Debtor,

20  meaning that a substantial number of claims could be asserted against each bankruptcy estate.  In

21  addition, each Debtor is potentially a party to numerous transactions which require careful

22  compilation and review in order to accurately analyze the Debtor's respective assets and potential

23  contractual obligations.

24       84.    The challenge of completing the documents and information necessary to make the

25  required disclosures regarding each Debtor's business will be exacerbated by the fact that the

26  same key persons that will be responsible for completing this task also will need to dedicate their

27  time and attention to handling other demands attendant to the Chapter 11 cases.  The Companies

28

Cooley LLP
Attorneys At Law
San Diego

27

employ only limited personnel who are capable of assisting in the preparation of the required

Schedules, and the Companies have numerous other pressing demands in connection with the

orderly administration of this case.

85.    To this end, due to the demands on the Debtors created by (i) filing these chapter

11 cases and the financial difficulties giving rise thereto, (ii) the need to maintain continuity in the

Debtors' businesses, (iii) the need to prepare the Debtors' first day filings and (iv) the immediate

need to address the requirements as set forth in the Office of the United States Trustee's operating

guidelines, among other things, the Debtors will not be able to complete their respective

Schedules within the fourteen day statutory period.  The Debtors each require immediate relief

from the pending filing deadline in order to allow them to prioritize the many and varied tasks

arising from commencement of these cases within their limited workforce.

86.    Because the requested extension of time is short, will allow the Debtors to file

more accurate Schedules, thereby lessening or eliminating the need to amend their Schedules

later, and will not prejudice creditors, I believe that good cause has been shown for the requested

15 day extension from the current deadline to a date that is 14 days thereafter.

**4.    Motion for Order Establishing Limited Notice Procedures**

87.    Between the Companies, there are hundreds of vendors, members, former

employees and others who are potentially either creditors or parties in interest entitled to notice of

various matters in these bankruptcy cases, pursuant to Rule 2002 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules").  In an effort to minimize the administrative

burden and expense on the Companies while remaining cognizant of the due process concerns of

creditors and other parties in interest, the Companies are also bringing a Motion for an order

establishing limited notice procedures.

88.    It would be impractical and would impose a large administrative and economic

burden upon the Debtors' estates if the Debtors are required to copy and mail notices, pleadings

and other documents related to every matter in these cases to the hundreds of parties collectively

listed on their creditor matrices.  If this Court authorizes the Debtors to limit the scope of service

for Limited Notice Matters to the Limited Service List (as those terms are defined in the Motion), all interested parties will be fully advised of any pending matter that potentially affects them. Furthermore, immediate relief is warranted. Until the Court approves the requested limited notice procedure, the Debtors' estates will incur significant and unnecessary costs associated with noticing hundreds of persons of the numerous matters arising during the active early stages of these cases. The earlier the Debtors can implement the notice procedures, the greater the savings to the Debtors' estates and their creditors

**5.    Motions for Order Authorizing Payment of Pre-Petition Wages and Critical Vendors**

89.    The Debtors will also be bringing a motion seeking the authorization of the payment of certain pre-petition wages owed to necessary employees. The Debtors may also be required to file a motion seeking payment of certain amounts owed to critical vendors. Such motions, along with a supplemental declaration in support, will be filed with the Court, as soon as the details regarding the amounts and the specific employees owed such wages and/or critical vendor claims are able to be determined with more exactitude.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 11th day of June, 2013 at San Diego, California.


By: Thomas C. Hebrank
Title: Chief Restructuring Officer

EXHIBIT A

| Company | Parcel | APN(s) | Acreage |
|---|---|---|---|
| VLRC | C | 927-680-002 | 80.02 |
| | E | 927-680-004 | 350.39 |
| | F | 927-680-005 | 95.03 |
| | Sundance Ranch | | 600.00 |
| | Lake | | 1,000.00 |
| VLU | B | | 910.31 |
| | D | | 221.07 |
| | G | 927-320-079 | 939.75 |
| | H | | 1,072.22 |
| | I | | 2,644.09 |
| | 1 | 927-380-019 | 84.32 |
| | 2 | 927-380-020 | 50.01 |
| | 3 | 927-380-021 | 87.52 |
| VLVR | A | 927-380-023 | 363.44 |
| VLG | Orchard | 917-150-006 | 120.00 |
| | | 917-240-015 | 20.00 |
| ATR | 4 | 927-320-062 | 183.12 |
| | 5 | 927-320-063 | 120.44 |

Cooley LLP
Attorneys At Law
San Diego

1

<u>EXHIBIT B</u>

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Cooley LLP
Attorneys At Law
San Diego

